IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE ON BEHALF OF TYLER H., JR. V. TYLER H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF TYLER H., JR., A MINOR CHILD, APPELLEE,
V.
TYLER H., DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLANT,
AND JESSICA B., THIRD-PARTY DEFENDANT, APPELLEE.

Filed January 12, 2021.   No. A-20-374.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Affirmed.

Sean M. Reagan and Megan E. Shupe, of Reagan, Melton & Delaney, L.L.P., for appellant.

No appearance for appellee State of Nebraska.

No appearance for appellee Jessica B.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Tyler H. appeals from an order of the district court for Lancaster County, which order determined paternity, custody, parenting time, and child support for Tyler and Jessica B.'s son, Tyler H., Jr. (TJ). On appeal, Tyler challenges the district court's decision to award the parties with joint legal and physical custody of TJ. Tyler also challenges the parenting plan created by the district court and asserts that the court created a "conditional" order when it stated that TJ starting school would constitute a material change of circumstances which may warrant a change in custody. For the following reasons, we affirm the order of the district court.

## BACKGROUND

Tyler and Jessica were never married, but they were in a dating relationship which began in June 2017. Jessica became pregnant a few months after their relationship began, and she gave

birth to TJ in Lincoln, Nebraska, in July 2018. Tyler was present for TJ's birth. However, at that time, Tyler was attending school in Ames, Iowa, in order to become a veterinarian and he had to return to school shortly after TJ's birth. Tyler saw TJ whenever he returned to Lincoln during his breaks from school. He also saw TJ on weekends when either Jessica or Tyler's parents would bring TJ to visit. Tyler and Jessica ended their relationship in December 2018. In May 2019, Tyler graduated from veterinary school and returned to Lincoln. Jessica and Tyler agreed at that time to share custody of TJ such that they each had physical custody of TJ every other week. This agreed upon parenting time schedule continued through the district court proceedings.

The district court proceedings were initiated in August 2018, when the State filed a paternity action against Tyler, seeking financial support for TJ. Subsequently, Tyler was given leave by the district court to add Jessica as a third-party defendant to the State's action. Tyler then filed an answer and a cross-complaint. Therein, he admitted that he was TJ's father. He then asked the court to award him sole legal and physical custody of TJ. However, he conceded that "this may be an appropriate case for joint physical and legal custody." Jessica also filed an answer and cross-complaint. She too, indicated that Tyler was TJ's father. Jessica requested that the court award her sole legal and physical custody of TJ subject to Tyler's reasonable right to parenting time.

Trial was held on February 19, 2020. The State waived its appearance. At trial, Jessica testified regarding her current circumstances. In September 2019, Jessica moved to a three-bedroom rental home in Daykin, Nebraska, in order to be closer to her family who resides in Tobias, Nebraska, a town located only 7 miles away from her home in Daykin. Jessica resides with her three children--TJ, and a daughter and a son from a previous relationship. Jessica was recently awarded sole physical custody of her daughter. Jessica did not explicitly explain whether she also has sole physical custody of her other son, but evidence in our record suggests as such. Each of the three children have their own rooms in Jessica's home and Jessica sleeps in a nonconforming bedroom in the basement of the home.

Prior to moving to Daykin, Jessica briefly lived with her parents in Tobias. Prior to that, Jessica lived in Lincoln. When TJ was born, Jessica lived in an apartment on Trenridge Road in Lincoln. She admitted that she fell behind in paying her rent on multiple occasions and, ultimately, was evicted from that apartment. After that eviction, Jessica moved to a different apartment located on South 31st Street. She was evicted from that apartment after only 5 months.

At the time of trial, Jessica had been employed at a Farmers Cooperative in southeast Nebraska for approximately 6 weeks. She worked 40 hours per week as an elevator operator in three different communities and earned $13.50 per hour. She will be eligible to receive benefits, including health insurance, after working there for a period of 6 months. Jessica indicated that her employment at the Farmers Cooperative is contingent on the outcome of a pending felony charge filed against her. Jessica also works part time for three different churches as an organist. She indicated that, depending on the time of year, she can make between $400 and $700 per month from her organist work.

Previously, Jessica worked in Lincoln for Omaha Truck Center, Inc., for approximately 6 months. She left that job to accept her current job at the Farmers Cooperative. Her current employment pays her 50 cents more per hour.

Jessica has a not insignificant criminal history. From 2010 to 2013, she was convicted of four felonies, including unauthorized use of a financial transaction device and three separate theft offenses. As a result of these convictions, Jessica was sentenced to one interval in prison and three separate intervals in jail. From 2012 to 2018, Jessica was convicted of seven misdemeanor offenses, including theft by shoplifting; second degree forgery (three times); committing fraud to obtain assistance; and issuing a bad check (two times). Each of Jessica's felony and misdemeanor convictions were alleged to have occurred prior to Jessica giving birth to TJ. In fact, her most recent offense was alleged to have occurred in November 2017.

At the time of the trial, Jessica still had one outstanding charge filed against her. She was charged with theft by deception ($1,500 to $4,999), a Class IV felony, which was alleged to have occurred in March 2016. Jessica testified that she was set to enter a plea to the charge 2 days after the custody trial. She acknowledged that she may receive a sentence of incarceration for this charge.

Jessica readily admitted to her criminal history during her testimony. She explained that during that time in her life, she was acting "very selfish and careless." She testified that she has grown a lot since committing those offenses and has learned from her experiences. In particular, she indicated that she knew that her actions had hurt her daughter "very bad." Jessica testified that she informed Tyler of her criminal history a few months into their relationship. She told him that she had been in prison and told him about a felony conviction she obtained in another state. At that time, she did not tell Tyler about each and every one of her charges and convictions. However, 1 or 2 months into her pregnancy with TJ, she had a more detailed discussion with Tyler about the specifics of her criminal history. She also had a discussion about this topic with Tyler's parents. Jessica told Tyler about her pending felony charge relating to the March 2016 offense almost immediately after her arrest in 2019.

Notwithstanding Jessica's criminal history, she testified that she was a good mother to her children. She described her daily routine with the children as revolving around their needs, including, helping her daughter with homework after school, playing with the younger two children, cooking and feeding the children dinner, giving them baths and reading them books, and putting them to bed. Jessica explained that all three of her children share a very close relationship with each other. Jessica indicated that, currently her mother provides daycare for TJ and her other son while Jessica is at work.

Jessica expressed some concerns about Tyler, including that he had knocked her down during an argument and had recently called her "an arrogant bitch" in TJ's presence. Jessica also expressed frustration with Tyler's refusal to communicate with her about such things as potty training TJ. Ultimately, however, Jessica asked that the court award the parties with joint legal and physical custody. She did ask that the court give her final decisionmaking authority as to TJ's education. She believed that she and Tyler could work together to make other decisions on TJ's behalf.

Jessica called two of her friends to testify on her behalf. Jessica Maas testified that she has been friends with Jessica since they were both children. Now, Maas' daughter is friends with Jessica's daughter. Maas indicated that she was aware of Jessica's criminal history, but believed her to be "a loving, caring, devoted mother."

Melissa Hacker testified that she met Jessica when Tyler introduced them. Hacker then became good friends with Jessica. Hacker indicated that she was aware that Jessica had a criminal history, however, it was clear from her testimony that Hacker did not know the specifics of that history other than that Jessica had been in prison and had a felony conviction. Hacker testified that she believed Jessica to be a good mother. To the contrary, Hacker raised concerns about Tyler's parenting. After having observed Tyler discipline his daughter, Hacker believed Tyler to have been "somewhat aggressive." Hacker had also witnessed Tyler discipline someone else's child by "smacking" the child in the back of the head after the child had stepped on Tyler's boots.

Tyler testified that at the time of trial, he was living in a two-bedroom apartment in Lincoln with his girlfriend, Paige, and her 9-month-old son. He and Paige had been dating since March 2019, and had lived together since October 2019. Every other week when TJ is living with Tyler, TJ and Paige's infant son share a bedroom. Tyler also has a daughter from a previous marriage, who was 10 years old at the time of the trial. He shares custody of his daughter with his ex-wife such that his daughter stays with him for six overnights every 14 days during the school year and every other week during the summer. When he has custody of his daughter, she sleeps in a loft space in the apartment. Tyler testified that his daughter and TJ have a good relationship.

Tyler is currently employed as a veterinarian at Arkcare, a traveling swine veterinary clinic. However, Tyler explained that he was not yet a licensed veterinarian in Nebraska because he had just passed his board exam in December 2019 after having failed the exam on two prior occasions. Tyler testified that he was awaiting the processing of his application for licensure and expected to be licensed soon. Tyler indicated that he currently earns a salary of $46,000 per year at Arkcare, but receives no benefits, including either retirement benefits or health insurance. When he becomes a licensed veterinarian, Tyler expects his annual income will increase to $70,000. He still will not receive any benefits through his current employment however. During his testimony, Tyler admitted that prior to his graduation from school in May 2019, he provided little, if any, financial support for TJ. However, Tyler also indicated an inability to do so during that time.

Tyler testified at trial that he was requesting sole physical custody of TJ. He recommended that if he were awarded sole physical custody, that Jessica should have parenting time with TJ every other weekend and during alternating weeks in the summer. Tyler acknowledged that he had previously agreed with Jessica on a temporary joint physical custody arrangement. He did not testify as to any specific difficulties which arose as a result of this custody arrangement; however, he testified that he was unaware of Jessica's unstable living environment and "the depth of her criminal history," when he entered into the agreement.

Specifically, Tyler explained that when he agreed to share joint physical custody with Jessica pending these proceedings, he was unaware of her prior evictions and her numerous moves. Tyler testified that he had been aware that Jessica had been to prison, but he only knew of her being convicted of one forgery charge and one felony charge in Virginia. He discovered the rest of her criminal history during his preparation for the custody proceedings. Tyler expressed a particular concern with Jessica's pending felony charge and whether she would be sentenced to a period of incarceration. He further explained that Jessica's recent move to Daykin complicated the joint physical custody arrangement, as their homes were now 70 miles and approximately an hour's drive apart. Ultimately, Tyler indicated that because of his concerns about Jessica's circumstances, he now believed that it was in TJ's best interests for him to have sole physical custody.

In his proposed parenting plan, Tyler indicated that he was requesting the parties be awarded joint legal custody of TJ. He testified at trial that he and Jessica have been able to communicate, cooperate, and act in TJ's best interests. He also believed that Jessica loved TJ and that TJ loved Jessica. Tyler testified that he loves TJ very much and the two of them have a good relationship.

Tyler testified that he "wouldn't say that [he was] aggressive" in his discipline of his older daughter but that he was "firm." He stated that he tries "very hard not to be aggressive" with her. He admitted to previously spanking his daughter, but denied using that form of punishment at the time of trial or having ever spanked TJ. Tyler testified that he now disciplines by explaining how to modify the child's behavior. Tyler clarified Jessica's friend's testimony regarding him hitting a child in the back of the head. Tyler explained that the child had stomped on his foot repeatedly despite Tyler asking him to stop. Tyler then "flicked" the child on the forehead. Finally, Tyler denied ever pushing Jessica down. He explained that on one occasion during an argument, he tripped over some shoes and fell into Jessica, knocking both of them onto the floor. He described the incident as "an unfortunate circumstance" and admitted that it had scared the children.

Tyler also offered the testimony of his girlfriend, Paige, and his father, Burton. Paige testified that Tyler is a "great father" who is very "interactive" with his children and who helps her care for her young son. Paige believed that TJ had a bond with Tyler and that Tyler attends to both TJ's physical and emotional needs. Upon being asked if he had an opinion of Tyler as a father, Burton testified that he thinks Tyler "does a very adequate job being a father." He then agreed that Tyler was a "good dad." Burton believed that TJ had a bond with Tyler.

After the trial, the district court entered an order finding that Tyler was TJ's father and awarding Tyler and Jessica joint legal and physical custody of TJ. The court explained that the parties should continue to share physical custody of TJ such that they each have parenting time with TJ on a "week-on, week-off" schedule. However, the court noted that this custody arrangement was subject to modification when TJ started school:

> It is impossible at this time to predict what will be in the minor child's best interests once he is to begin school. This is especially true due to the recent instability in the living situation of [Jessica], her lack of steady employment, and her criminal history. Therefore, when the child is to begin school, it shall constitute a material change in circumstances for which the matter can be brought back before the Court for determination of primary physical custody, parenting time and support going forward.

The district court also created a provision in the event that Jessica was sentenced to a period of incarceration on her pending felony charge. The court indicated that if Jessica was incarcerated, TJ "shall remain in [Tyler]'s physical custody until she is released." Given the parties' financial situation and the joint custody arrangement, the district court did not require either Tyler or Jessica to pay child support.

Tyler appeals from the district court's order here.

## ASSIGNMENTS OF ERROR

On appeal, Tyler assigns as error the district court's decisions to award joint legal and physical custody of TJ to the parties, to divide the parties' parenting time such that each parent has TJ every other week, and to create a "conditional" custody determination.

## STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## ANALYSIS

### CUSTODY

Under the Parenting Act adopted by the Nebraska Legislature, the concept of child custody encompasses both "legal custody and physical custody." Neb. Rev. Stat. § 43-2922(7) (Reissue 2016). On appeal, Tyler challenges the district court's decision to award the parties with joint legal and joint physical custody. He asserts that he should have been awarded sole legal and physical custody of TJ given Jessica's unstable housing situation, her criminal history, including her pending felony charge, and her recent decision to uproot all three of her children from Lincoln to Daykin.

When custody of a minor child is an issue, child custody is determined by parental fitness and the child's best interests. See *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id*. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides as follows:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other relevant factors a court may consider in determining a child's best interests include general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and the parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character, parental capacity to provide physical care and satisfy educational needs of the child; and many other factors relevant to the general health, welfare, and well-being of the child. *Maska v. Maska, supra.*

Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent. Neb. Rev. Stat. § 42-364(3) (Reissue 2016).

## LEGAL CUSTODY

"Legal custody" focuses entirely on decisionmaking authority and is defined as "the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat.§ 43-2922(13) (Reissue 2016). In his brief on appeal, Tyler argues that he should have been awarded sole legal custody of TJ because he "is the proper parent to make fundamental decisions" for TJ, as Jessica has demonstrated an instability in both her housing and her choices to engage in criminal activity. Brief for appellant at 16. Tyler also asserts that he and Jessica are unable to effectively communicate with each other.

We first note that, although in his cross-complaint Tyler indicated he was seeking sole legal custody of TJ; at trial, Tyler did not specifically testify that he should be awarded sole legal custody. To the contrary, in Tyler's proposed parenting plan, which was offered as an exhibit during the trial, Tyler indicated that he was now requesting joint legal custody of TJ. Moreover, contrary to Tyler's assertions in this appeal that he and Jessica do not communicate well, at trial, he testified that he and Jessica have been able to communicate and cooperate with each other in the interest of TJ. Tyler testified that he and Jessica have been able to set aside their differences in order to coparent TJ.

At trial, Jessica also requested that the parties be awarded joint legal custody of TJ. She specifically testified that she and Tyler had been able to work together to make medical decisions on behalf of TJ, including deciding to change his pediatrician. She did request that the court consider awarding her final decisionmaking authority as to TJ's education. She also expressed some hesitation about Tyler's willingness to communicate with her on more routine issues, like potty training TJ.

Given that at trial both Tyler and Jessica asked to be awarded joint legal custody of TJ and given the evidence that they have been able to work together to make decisions that are in TJ's best interests, we do not find that the district court abused its discretion in awarding the parties joint legal custody.

"Physical custody" is defined by the Parenting Act as "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." § 43-2922(20). As such, although the Parenting Act does not speak in terms of "sole" or "primary" physical custody, it contemplates that an award of physical custody will determine the child's primary residence and identify the parent who will exert "significant" and "continuous" parenting time over the child. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). "Joint physical custody" as defined by the Parenting Act means "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." § 43-2922(12).

On appeal, Tyler asserts that he should have been awarded sole physical custody of TJ because he "provides consistency and stability in terms of residence, employment, safety, and lack of criminal history." Brief for appellant at 20. Tyler also argues that an award of joint physical custody was not appropriate as a result of Jessica's recent move from Lincoln to Daykin. Upon our review of the evidence presented at trial, we cannot say that the district court abused its discretion in awarding the parties joint physical custody of TJ.

At trial, Tyler repeatedly indicated that he was seeking sole physical custody of TJ only because of Jessica's criminal history, including her pending felony conviction, and her recent move from Lincoln to Daykin. Outside of these two concerns, Tyler was unable to identify any problems with Jessica's parenting of TJ. By the time of trial, the parties had been sharing custody of TJ on a week-on, week-off basis for approximately 9 months. Tyler did not testify as to any problems in this temporary custodial arrangement. In fact, Tyler testified that he knows that Jessica loves TJ and that TJ loves and needs Jessica. Tyler indicated that when TJ returns to his home after spending the prior week with Jessica, TJ is always generally healthy and well behaved. Tyler did not provide any information about current issues related to the distance between the parties' homes.

We are cognizant of Tyler's concerns related to Jessica's criminal history. However, the evidence presented at trial revealed that Jessica's offenses, including the offense still pending, were all committed prior to her giving birth to TJ. Additionally, while there was conflicting evidence about how much Tyler knew about Jessica's criminal history prior to TJ's birth, it is clear that at a minimum, he knew that she had been convicted of at least two felonies and had been to prison. Despite this knowledge, Tyler permitted Jessica to be TJ's sole care provider for the first 11 months of his life while Tyler was away at school. Additionally, despite Tyler's knowledge of at least portions of Jessica's criminal history, Tyler agreed to share custody of TJ with Jessica upon his return to Lincoln after graduating from school. And, as we discussed above, Tyler did not testify as to any specific problems the parties have incurred as a result of the temporary custody arrangement.

While Tyler raises a particular concern with Jessica's pending felony conviction and whether her plea to that offense will result in her serving time in jail, we note that the district court addressed this issue in its order. After the court awarded the parties with joint physical custody of TJ, it stated: "In the event [Jessica] is incarcerated on her pending charge, the minor child shall

remain in [Tyler]'s physical custody until she is released. On the first Sunday following any release from incarceration, [Jessica]'s parenting time shall resume."

The evidence in our record indicates that TJ is currently receiving appropriate care from both Tyler and Jessica. There is nothing in the record to suggest that the agreed upon temporary joint custody arrangement was not working or that it is not in TJ's best interests to continue with that arrangement. Based upon our review of this evidence, we simply cannot say that the district court abused its discretion in awarding the parties with joint physical custody of TJ.

PARENTING PLAN

Tyler also assigns as error that the district court abused its discretion in entering a parenting plan which gave each party parenting time with TJ every other week. However, Tyler's argument regarding this assigned error is primarily a restatement of his assertion that the district court erred in awarding the parties joint physical custody of TJ. Tyler states, "An award of primary physical custody to [Tyler] would have been the appropriate allocation of parenting time." Brief for appellant at 23.

To the extent that Tyler also generally asserts that the parenting plan is an abuse of discretion because it requires too much traveling for TJ, as he will have to be in the car for the 70-mile trip between Lincoln and Daykin each week, Tyler did not testify as to any problems with this travel arrangement at trial. Jessica testified that she had moved from Lincoln in August 2019. Accordingly, by the time of the trial, TJ had been traveling back and forth from his parents' homes for more than 6 months. Tyler did not testify as to any issues with TJ traveling between homes every week during this 6-month period. Moreover, in his brief on appeal, Tyler fails to suggest a different allocation of parenting time pursuant to a joint custody arrangement. Given our finding above that there was no abuse of discretion in awarding the parties joint physical custody of TJ and given Tyler's failure to suggest a different parenting plan, we affirm the decision of the district court which provided each party parenting time with TJ every other week.

NOT A CONDITIONAL ORDER

In his brief on appeal, Tyler asserts that the district court failed "to make a permanent custody determination" when it indicated that the current joint custody order could be revisited when TJ reaches school age. Brief for appellant at 25. Tyler further asserts that the district court's custody order was a "conditional order" because "it leaves to speculation and conjecture what its final affect may be." *Id*. at 26.

The district court's order granting the parties joint physical and legal custody of TJ is not a "void" conditional order as Tyler suggests. A conditional judgment is one that purports to be final but that is dependent upon the occurrence of uncertain future events. *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006). Here, the district court awarded the parties with joint physical and legal custody of TJ effective immediately after the entry of its April 2020 order. The court's custody order is not dependent upon the occurrence of any uncertain future event. To the contrary, the district court expressly declined to enter a conditional order when the court indicated that it would not presently address TJ's custody when he reached school age because the court could not predict what will then be in TJ's best interests.

TJ reaching the age of five and beginning school are not uncertain future events. As such, the district court certainly could have created an alternative custody arrangement addressing that time period as requested by Tyler. However, we do not find that under the facts of this case, the court abused its discretion in declining to enter such a future schedule. The question of what will be in TJ's best interests at the time he reaches school age is essentially unknown. By the time TJ reaches school age, the parties will have been exercising the joint physical and legal custody arrangement for more than 3 years. It would be very difficult for the district court to predict how that arrangement will affect TJ. Furthermore, the parties' lives before and after TJ's birth involved frequent and significant changes, and it is reasonable to suspect that their circumstances could be different in 3 years. In particular, the district court will have more accurate information regarding Jessica's ability to maintain some stability in her housing and employment situation and whether she has continued to stay out of legal trouble. Similarly, the district court will know more about Tyler's work situation after having passed his examinations and becoming a licensed veterinarian. The court will also be able to determine the stability of Tyler's relatively new relationship with his live-in girlfriend. It is also possible that by the time TJ reaches school age, the parties may again both reside in Lincoln or may reside even further apart than they do now. Under the circumstances of this case, we do not find that the district court abused its discretion in reserving the issue of school-age custody and parenting time for future determination.

To the extent that Tyler argues that the district court's order violates the general rule that a change in circumstances which was known by the district court when the original decree was entered does not constitute a material change in circumstances for purposes of modification of the decree, we disagree with such assertion. The intent underlying that rule is that a proceeding to modify a decree is not a retrial of the original case nor a review of the original decree. See *Wagner v. Wagner*, 224 Neb. 155, 396 N.W.2d 282 (1986). The phrase "change of circumstances" should not be mechanically construed. *Marez v. Marez*, 217 Neb. 615, 350 N.W.2d 531 (1984).

While the district court was aware that TJ will reach school age in a few years, it essentially reserved ruling on what custody order or parenting time schedule will be in TJ's best interests at that time. Under these circumstances, addressing the issue in a future modification proceeding will not constitute "a retrial of the original case [or] a review of the original decree." *Wagner v. Wagner*, 224 Neb. at 157, 396 N.W.2d at 283. To hold otherwise would be to apply the phrase "change of circumstances" mechanically and in a manner contrary to the rule's purpose. As we explained above, given the parties' situations, the court acted reasonably in reserving the issue of school-age custody and parenting time.

Tyler also asserts that by failing to make a determination regarding custody of TJ when he reaches school age, the district court imposed a further financial burden on the parties. However, the current parenting plan adopted by the district court contains provisions which would enable the parties to minimize any future court costs or attorney fees they may incur when addressing changes to custody and the parenting time schedule when TJ reaches school age. The plan provides that

[t]o resolve future changes or conflicts regarding parenting functions, parenting time, or this Plan the parents shall first seek solutions through mutual agreement, without the need for judicial intervention, . . . and if unsuccessful then through the mediation process outlined in the Nebraska Parenting Act, prior to resorting to the court system.

- 10 -

Although the parenting plan requires court-approval before any modifications to the plan will be incorporated into a court order, the parties will incur little to no expense if they are able to resolve any necessary changes to TJ's custody or the parenting time schedule through mutual agreement.

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not abuse its discretion in granting the parties joint legal and physical custody of TJ or in entering a parenting plan providing each party with parenting time every other week. We also conclude that the court did not err in failing to decide custody of TJ when he reaches school age.

AFFIRMED.